Joseph T. Imperiale
**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799
(215) 981-4000

Jeffrey A. Carr
**TROUTMAN PEPPER**
**HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ  08540-6589
(609) 951-4116

*Attorneys for Plaintiff*
*Alstom Signaling Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALSTOM SIGNALING INC.<br>4545 East River Road<br>West Henrietta, NY  14586<br><br>Plaintiff<br><br>v.<br><br>PARSONS TRANSPORTATION GROUP INC.<br>100 M. Street, SE<br>Washington, DC  20003,<br><br>FIDELITY AND DEPOSIT COMPANY OF<br>MARYLAND<br>600 Red Brook Blvd.,<br>Owings Mills, MD  21117, and<br><br>FEDERAL INSURANCE COMPANY<br>251 N. Illinois Suite 1100,<br>Indianapolis, IN  46024.<br><br>Defendants | CIVIL ACTION NO:<br><br>COMPLAINT |

## COMPLAINT

Plaintiff Alstom Signaling Inc. ("Alstom") states this Complaint against Parsons Transportation Group Inc. ("Parsons"), and sureties Fidelity and Deposit Company of Maryland, and Federal Insurance Company (collectively, "Sureties"), and in support thereof, avers the following:

## PARTIES

1.      Alstom is a corporation organized under the laws of the Delaware and its principal place of business is 4545 East River Road, West Henrietta, New York 14586.

2.      Parsons is a corporation organized under the laws of the State of Illinois and its principal place of business is 100 M Street SE, Washington, District of Columbia 20003.

3.      Fidelity and Deposit Company of Maryland is a corporation organized under the laws of the State of Maryland and its principal place of business is 600 Red Brook Blvd., Owings Mills, Maryland 21117.

4.      Federal Insurance Company is a corporation organized under the laws of the State of Indiana and its principal place of business is 251 N. Illinois Suite 1100, Indianapolis, Indiana 46024.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District.  Venue is further proper because the Subcontract (defined below) provides that "[i]n the event of a dispute where the potential liability of either party is equal to or exceeds the amount of One Million Dollars ($1,000,000) either party may

bring an action in a court of competent jurisdiction where the project will be constructed or where [Parsons'] services are provided."

## GOVERNING LAW

7.     The Subcontract provides that "[a]ll claims, disputes and matters in question arising out of or relating to this Agreement or the breach thereof shall ... be governed by and construed in accordance with the laws of the State where the Project will be constructed without reference to its conflict of laws provisions."  The Project took place in New Jersey and therefore New Jersey law governs the parties' dispute.

## STATEMENT OF FACTS

8.     This litigation arises out of a federal mandate to implement Positive Train Control ("PTC") systems on New Jersey Transit's railways (the "Project").  Through a network of communication and engineering systems, PTC helps to monitor and control train movements so as to promote safety across America's railways.  In 2008, the federal government mandated that certain rail systems (including those at issue here) employ PTC by 2015.  Starting in 2011, Alstom has been working on behalf of Parsons to help New Jersey Transit meet its obligations.  For reasons outside of Alstom's control, the work has encountered years of delay, extensive disruptions, changes, and resequencing.  Alstom's additional efforts have cost millions of dollars.  Nonetheless, Alstom persisted with its work and submitted requests for additional payment and time, which it is entitled to under the Subcontract.  Unfortunately, Parsons has refused to honor the terms of the Subcontract.  To date, Parsons has failed to pay over $45 million that is due to Alstom for its efforts.  Of this amount, Parsons has already been paid at least $15 million from New Jersey Transit for Alstom's additional work, but refused to release the payment earmarked for Alstom.  Parsons subsequently manufactured "backcharges" in an attempt to justify its failure to pay.  To Alstom's knowledge, Parsons has not disclosed to the New Jersey or federal governments that Parsons decided to keep sums that were paid

on Alstom's behalf.  In this litigation, Alstom seeks to recoup those and other unpaid amounts owed

to Alstom under the Subcontract.

**I.      BACKGROUND**

9.      PTC systems are designed to prevent train-to-train collisions, over-speed

derailments, incursions into established work zones, and movements of trains through switches left in

the wrong position.  To accomplish this, the systems capture and relay critical information such as

the speed, location, and direction of trains, as well as switch positions and work zone locations.

10.     In 2008, new federal law mandated the implementation of PTC systems on

certain main lines of Class I railroads by 2015.  This momentous piece of legislation meant that PTC

would be required whenever five million or more gross tons of annual traffic and certain hazardous

materials are transported, and on all main lines that regularly carry intercity or commuter rail service.

11.      In furtherance of the PTC mandate, New Jersey Transit hired Parsons to

design, furnish, construct, test and commission the ASES II PTC system for a fixed price of

$151,317,328.26 (the "Prime Contract").

12.     PTC is a radio-based system with three primary and interconnected

components: 1) a centralized dispatch that transmits certain information (including speed restrictions)

to the train car; 2) a train car computer that accepts and processes the information; and 3) wayside

units that are installed in signal rooms within the required distance from the tracks and report

information (including switch positions, signal status, and vehicle location) to the dispatch and train

car computers.

13.     Integration of the PTC elements is fundamental to the system's success.  As

the Systems Integrator, Parsons was ultimately responsible for achieving complete interoperability of

the PTC system.  Among other things, this role required Parsons to ensure that the computers and

software utilized by Amtrak and other railroads on the Northeast Corridor could effectively

-3-

communicate with New Jersey Transit's PTC system.  Parsons was also responsible for leading the strategy and execution of the Project, including coordinating the necessary system integration tests and managing the master schedule.

14.     Alstom is a world-class provider of signaling systems, including those utilized to allow railway traffic to communicate with each other and ensure safe, seamless travel.

15.     In August 2011, pursuant to the Subcontractor Professional Services Agreement in the amount of $60,476,090.55 (the "Subcontract"), Parsons retained Alstom to implement the signaling component of the PTC system.  A true and correct copy of the Subcontract is attached as Exhibit A (due to the voluminous nature of the Prime Contract, which is in possession of both parties, only the Subcontract has been attached to this Complaint).

16.     Alstom's work included supplying the signaling equipment for the central office, supplying and installing the on-board computers into specified train cars, and providing the signaling equipment that would be installed in the waysides.

17.     Parsons retained responsibility for the integration and installation of signaling equipment in the central office and the waysides.  Parsons was also responsible for the radio-based communications system that transmitted information between the central office, the train computers, and the waysides.

18.     The Subcontract included schedule milestones that mandated completion of the base system in 2015.  Thereafter, Parsons was responsible for extensive operability testing so as to achieve Project closeout by December 2016.  Alstom based its price on the scope and period of performance set forth in the Subcontract.

19.     The Subcontract entitles Alstom to recover costs for changes in both the work and the schedule.

20.     Section GC 2 of the Subcontract states:

Services shall be performed in accordance with the Schedule for the Project as determined by the Contractor and the Client and any revision to that Schedule that may be subsequently issued. Subcontractor's compliance with the Schedule is of the essence and is a material provision of this Agreement. **Revisions to the Schedule … that result in increased or decreased cost to the Subcontractor are subject to the provisions of GC 5 (Changes).** (emphasis added)

21.     Alstom's schedule relief and compensation for schedule changes and/or additional work is determined in accordance with Section GC 5, the Subcontract provision governing changes in the work.  Of particular note, the parties are required to either agree on an extension of time and additional compensation or Parsons may issue a unilateral change order that affords Alstom additional compensation and an extension of time.  Subcontract Section GC 5 states:

This Agreement and the scope of the Subcontractor's Services may be revised, added to or reduced only by the Contractor's written order or direction. In the event Client orders or directs any change or alteration in the Subcontractor's services, Contractor will promptly notify Subcontractor of such order or direction and Subcontractor shall promptly comply with the order or direction of Client.

In the event Subcontractor receives a direction or order that will increase Subcontractor's cost or cause a delay in the performance of the Services, Subcontractor shall notify the Contractor of the increased cost or schedule impact in a timely manner. Subcontractor shall comply with the direction or order taking reasonable measures to minimize cost and schedule impact until Contractor confirms or rescinds the order.

Unless Contractor rescinds the order, Subcontractor shall promptly submit an estimate of the cost and schedule impact of the order. **Contractor and Subcontractor shall meet and agree on the cost and schedule impact and Contractor shall issue a written change order amending the terms of this Agreement. In the event Contractor and Subcontractor do not agree on the cost and schedule impact of the order, Contractor may issue a unilateral change order stating the additional compensation and time due to the order. Subcontractor may dispute the unilateral change order as provided by GC 15 (Governing Laws and Disputes).** Subcontractor shall continue performance of the Services, including Services subject to dispute during the time necessary to resolve the dispute. (emphasis added).

22.     In terms of payment, Parsons is required to promptly make payment to Alstom upon receipt of payment from New Jersey Transit, less any retainage provided by the Subcontract.  Section GC 4 states:

> The Subcontractor shall submit invoices periodically as required by Contractor in sufficient time for the Contractor to include them with the Contractor's invoices to Client, but not later than the tenth day of each month. The Subcontractor's invoices shall also be in the form required by the Client or the Contractor. Upon approval by the Contractor and after any adjustment reasonably required by the Contractor, the Subcontractor's invoice will be included in the Contractor's invoice to the Client. **Prompt payment shall be made to the Subcontractor upon and subject to the Contractor's receipt of payment from the Client for those services rendered by the Subcontractor in conformance with requirements of this Agreement, less any amount retained pursuant to this Agreement and/or the Prime Contract.**  (emphasis added).

23.     Years after Alstom commenced performance of the work, and just before the original 2015 PTC deadline, Congress extended the deadline from December 31, 2015 until at least December 31, 2018.

24.     New Jersey Transit and Parsons agreed to an extension of time in light of the extended PTC mandate.  By way of a change order to the Prime Contract, Parsons re-baselined the schedule to reflect a December 31, 2018 completion date, and Parsons received tens of millions of dollars, including monies earmarked for and paid to Alstom, from New Jersey Transit for this extended performance.

## II.     PARSONS' DELAYS FURTHER EXTEND THE PROJECT'S DURATION

25.     The parties proceeded to perform under the re-baselined schedule.  Parsons, however, was unable to meet the deadlines set forth in the extended and re-baselined schedule.

26.     Part of Alstom's scope involved retrofitting New Jersey Transit's existing train car fleet with on-board computers.  Alstom's schedule was therefore dependent on Parsons delivering the train cars on the required dates.  Parsons, however, failed to deliver the necessary train cars according to the scheduled delivery dates.  Alstom's retrofitting work was further delayed by,

*inter alia*, additional and unanticipated remediation work of defective train cars, variances in the types of train cars, and untimely pick up and testing of completed vehicles.

27.     Alstom's scope also included the design and manufacture of PTC equipment that others would install in the waysides.  This portion of the work was similarly delayed by Parsons and by other reasons outside of Alstom's control.  These impacts included: (i) system design changes and discrepancies; (ii) delayed inputs from Parsons and New Jersey Transit; (iii) changes to field survey design data; (iv) Parsons' failure to timely provide appropriate network coverage; (v) changes to the testing protocols; and (vi) re-scheduling needs of third parties.

28.     Alstom notified Parsons of these impacts, which increased the cost of Alstom's work and extended the Project schedule.

29.     Due to these delays, as well as delays to Parsons' individual scope of work, it became clear that the Project would not be completed by December 31, 2018.

30.     On May 16, 2019, Alstom submitted a Request for Equitable Adjustment ("REA") associated with delays and impacts to Alstom's train car work.  As described above, these impacts included a lack of sufficient vehicles for Alstom to retrofit, as well as defects and variability in the train cars that were ultimately provided to Alstom.  As a result, Alstom's REA sought schedule relief and additional compensation for the period between March 2018 and March 2019, in the amount of $2,927,175.60.

31.     Parsons never responded to Alstom's REA associated with delays to Alstom's vehicle production.

### III.   ALSTOM IS ASKED TO EXPEDITE ITS WORK TO SUPPORT PARSONS AND NEW JERSEY TRANSIT'S DESIRE FOR AN EXTENSION THROUGH DECEMBER 2020

32.     The Federal Railroad Association had authority to grant a two year extension through December 31, 2020, provided New Jersey Transit achieved certain progress criteria.

33.     To enable New Jersey Transit to meet the progress criteria, in August 2018, Parsons and New Jersey Transit approached Alstom and requested that overtime and additional shifts be added to expedite vehicle production.  New Jersey Transit and Parsons promised to compensate Alstom for any additional efforts that were undertaken, and Alstom relied on such representations and promises.

34.     Alstom marshalled its resources, working additional overtime and increasing the number of shifts.  Parsons and New Jersey Transit routinely visited Alstom's installation site to monitor Alstom's progress.

35.     On November 9, 2018, Alstom submitted a cost proposal to Parsons for its additional vehicle installation efforts through the end of 2018 in the amount $10,967,187.89.

36.     Alstom proceeded to complete its work in sufficient time to allow New Jersey Transit to request and receive an extension from the Federal Railroad Administration.  This occurred despite continued delays and impacts caused by Parsons, including Parsons' failure to deliver the vehicles in accordance with the agreed upon schedule.

37.     On January 30, 2019, Alstom submitted a REA to Parsons for its increased train car installation efforts between September 1, 2018 and December 31, 2018, in the amount of $7,440,461.55, which was approximately $3.5M less than its initial proposal.

38.     Parsons validated Alstom's REA and submitted it to New Jersey Transit for payment.  Despite Parsons and New Jersey Transit's promises to pay Alstom for its efforts, and in contravention of Parsons' obligation to issue a change order pursuant to the Subcontract, Parsons did not respond to Alstom's REA for an extended period of time.

## IV.   PARSONS DRASTICALLY ALTERS ALSTOM'S SCOPE OF WORK AND SCHEDULE

39.     With the Project now required to be complete by December 31, 2020, Parsons once again changed its implementation strategy.

40.     With respect to the installation of Alstom's signaling equipment in the waysides, Parsons now required Alstom to rollout the PTC systems on a line-by-line basis, i.e., separate rollouts for each of the rail lines, as opposed to rollouts by division that would have allowed multiple lines to be rolled out at once.  This more than doubled the number of required rollouts and drastically altered Alstom's scope of work.

41.     At the same time, Parsons failed to perform its role as Systems Integrator, which was critical to ensure the various elements of the system worked seamlessly together.  This caused additional delays to the Project, and Alstom was repeatedly asked to perform out-of-scope work that should have been performed by Parsons.

42.     In response to Parsons' Project extensions, delays, and scope changes, Alstom continually notified Parsons of the cost and schedule impacts and reserved its right to seek a schedule extension and an equitable adjustment to the Subcontract price.

43.     On August 5, 2019, Alstom submitted a REA for 24 months of extended durations throughout 2019-2020.  Alstom's REA contained a detailed narrative describing the discrete impacts to its work and schedule, of which Parsons was already on notice, and projected costs of $28,074,293.89 associated with the Project's extended durations and additional work.

44.     Parsons worked with its own scheduling consultant to validate Alstom's REA and presented it to New Jersey Transit for payment.

45.     Upon information and belief, Parsons communicated to New Jersey Transit that the full amount of Alstom's REA was due to Alstom, and by doing so represented that any amounts paid by New Jersey Transit would be held in trust by Parsons for distribution to Alstom.

V.     **PARSONS REFUSES TO PAY ALSTOM FOR ITS WORK DESPITE RECEIVING SUBSTANTIAL PAYMENTS ON ALSTOM'S BEHALF**

46.     As of August 2019, Alstom had submitted three substantial requests for equitable adjustment of the contract price and/or schedule to Parsons: (i) a $2.9M REA for impacts to

Alstom's train car production (the "Train Car Impacts Claim"); (ii) a $7.4M REA for train car acceleration efforts directed by New Jersey Transit and Parsons to obtain an extension from the Federal Railroad Administration (the "Additional Measures Claim"); and (iii) a $28M REA associated with the Project's extended durations throughout 2019-2020 (the "Extension of Time Claim").

47.     As discussed above, Parsons did not respond to the Train Car Impacts Claim, and Parsons has not made any payment to Alstom associated with this REA.

48.     With respect to Alstom's Additional Measures Claim and Extension of Time Claim, Parsons independently validated the REAs and presented them to New Jersey Transit for payment.  More than a year after Alstom submitted its Additional Measures Claim, Parsons wrote to Alstom stating that New Jersey Transit had acknowledged entitlement to additional compensation for both of Alstom's REAs.

49.     Parsons subsequently engaged New Jersey Transit in negotiations concerning the Extension of Time Claim and the Additional Measures Claim.  Alstom requested to be part of the negotiations but Parsons denied Alstom access.

50.     On June 3, 2020 Parsons provided Alstom with a proposal of $17,335,361, which included $14,780,815 for Alstom's Extension of Time Claim and $2,574,546 for the Additional Measures Claim.

51.     That same day, Alstom rejected Parsons' proposal and directed Parsons not to accept the proposed amount on Alstom's behalf.

52.     Contrary to Alstom's express direction, Parsons proceeded to settle both of Alstom's REAs, as well as Parsons' own claims, with New Jersey Transit via change orders to the Prime Contract.

53.     On September 21, 2020, Parsons notified Alstom that it had settled Alstom's Additional Measures Claim for $2.7M of the $7.4M submitted and validated by Parsons.  Parsons maintained that it would only release the $2.7M if Alstom would enter into a "supplemental agreement" stating that any payment constituted a full and final settlement of Alstom's REA. Alstom refused to waive its rights for the full amount of the REA and thus refused to sign the "supplemental agreement."  Alstom further stated that it expected to receive payment for the work it has performed and for which New Jersey Transit issued payment, as is required by provision GC 4 of the Subcontract and applicable law, and that Alstom expressly reserved its right to seek recovery of the remainder of its REA.

54.     Parsons reversed course and agreed to pay Alstom its share of the amounts received from New Jersey Transit, without requiring Alstom to sign the "supplemental agreement" and with a reservation of rights by both parties.  To date, Alstom has received less than $2.5M associated with its Additional Measures Claim for the acceleration efforts.

55.     On October 14, 2020, Parsons informed Alstom that it also settled Alstom's $28M Extension of Time Claim, along with Parsons' own delay-related claims.  As a result of the impacts and extensions to the Project, New Jersey Transit agreed to pay over $30M.

56.     Despite acknowledging that Alstom was entitled to at least $15M of this amount, and despite receipt of such sums from New Jersey Transit, Parsons has refused to release any of the $30M settlement to Alstom in direct contravention of GC 4 of the Subcontract and applicable law.

57.     In fact, Parsons did not even inform Alstom that it settled Alstom's Extension of Time claims until seven weeks after the change order was executed.  Then, only after receiving the initial payment from New Jersey Transit, Parsons disclosed that it had somewhere between $9M and $9.3M in claims against Alstom, which it was making to offset amounts paid by New Jersey Transit

on Alstom's behalf.  This was the first time Alstom had been informed of any of these claims, some

of which date back to 2017.  Parsons' claims lacked even the most basic supporting documentation.

58.     Parsons also informed Alstom that it was withholding sums under a $17.9M

"Risk Reserve" for liquidated damages even though no such damages had been paid to New Jersey

Transit.  The Subcontract is clear and provides that Parsons is only entitled to recover liquidated

damages from Alstom if: (i) New Jersey Transit collects liquidated damages from Parsons; and (ii)

the associated delays are caused by the sole fault of Alstom.

59.     Despite withholding payment for a "Risk Reserve" for liquidated damages,

Parsons does not allege that either of these conditions has been met.  Parsons has not provided any

further details concerning its "Risk Reserve".

60.     On January 19, 2021, after receiving its second installment payment from

New Jersey Transit associated with extended project durations, Parsons identified another $8.3M in

supplemental claims against Alstom.  Its supplemental claims were similarly unsupported.

61.     Parsons took the position that its claims—all of which were generated after it

settled with New Jersey Transit—excused Parsons' obligation to release New Jersey Transit's

payments that had been earmarked for Alstom.

62.     Parsons has refused to provide any additional information supporting its

alleged claims, and continues to improperly withhold payment from Alstom in contravention of the

Subcontract and applicable law.

63.     To date, Parsons has not released any funds paid by New Jersey Transit on

behalf of Alstom's Extension of Time Claim.  Upon information and belief, Parsons never disclosed

to the New Jersey or federal governments that at least $15 million earmarked for Alstom would be

retained by Parsons.

64.     Parsons' settlement with NJT not only provided for insufficient compensation, but Parsons failed to secure a release from liquidated damages, allowing NJT to reserve its right to assess liquidated damages despite the fact that NJT had accepted responsibility for the delays to the Project.

## VI.   PARSONS EXTENDS THE PROJECT THROUGH DECEMBER 2021 AND BEYOND WITHOUT PAYING ALSTOM

65.     Despite Parsons' failure to pay Alstom for its efforts, Alstom completed the necessary work and New Jersey Transit achieved PTC System Certification by the federally mandated deadline of December 31, 2020.

66.     As the Project should have been concluding, however, Parsons continued to make additional work commitments to New Jersey Transit without consulting Alstom.  Parsons then demanded that Alstom support its upstream commitments, which significantly expanded Alstom's scope of work and time of performance.

67.     Alstom continued to notify Parsons of the associated additional cost and schedule impacts to Alstom's work.

68.     On November 18, 2021, Parsons issued a unilateral directive to Alstom officially extending the Project until December 31, 2021.

69.     Even though Parsons and New Jersey Transit had agreed that the work performed after the original deadline of 2015 gave rise to additional compensation, Parsons maintained that no monies were owed for the additional work performed in 2021.

70.     In accordance with the Subcontract, on December 17, 2021, Alstom submitted a cost proposal for its additional efforts in the amount of $7,561,913.86.

71.     On January 24, 2022, Parsons summarily rejected Alstom's proposal, claiming that 100% of Alstom's work on the Project in 2021 was part of its base scope.  Parsons made no effort to explain how work never contemplated by the original Subcontract and being

performed years after the original deadline could be part of the base scope, nor did it acknowledge the repeated impacts and extensions to the Project.

72.     Alstom continues to work on the Project today and Parsons is on notice that Alstom is incurring costs for additional work performed in 2022, which are properly recoverable under the Subcontract.

73.     On April 20, 2022, Alstom submitted a cost proposal for additional efforts expected to be expended in 2022, in the amount of $1,251,827.40.  As before, Parsons summarily rejected Alstom's proposal.

74.     It is Alstom's understanding that Parsons has agreed to another extension through December 2022, although Parsons has not formally notified Alstom of this agreement.

75.     It has now been more than a decade since Alstom and Parsons entered into the Subcontract, which contained a discrete scope of work and assumed the base system would be completed by 2015.  Alstom's efforts have greatly exceeded any reasonable contemplation of the Subcontract, and the Project does not reflect the originally contemplated work upon which Alstom based its price.  Nonetheless, Parsons continues to expand Alstom's scope of work and time of performance, while refusing to pay Alstom for its additional efforts.

76.     Further, despite the fact that New Jersey Transit already has beneficial use of the vehicles in revenue service (triggering the contractual start date of Alstom's warranty), Parsons refused to acknowledge the warranty start date.  Instead, it continues to demand that Alstom perform work on the significantly-expanded Project, without payment and without recognizing Alstom's continued efforts as part of the warranty period.

77.     Parsons has not limited its payment withholding to Alstom's REAs.  It has withheld over three and a half million dollars in undisputed invoices, for work performed as far back as 2021.

78.     While Alstom continues to perform its contractual obligations in good faith, significant payment remains due for Alstom's work on the Project, much of which has been paid to Parsons but that Parsons has failed to release.

79.     As a result of the continuing and outstanding balances due by Parsons to Alstom, on February 16, 2022, Alstom gave written notice of its then-current claim on the payment and performance bonds supplied by Fidelity Deposit Company of Maryland and Federal Insurance Company (Alstom's "Bond Claim").  A true and correct copy of Alstom's Bond Claim is attached hereto as Exhibit B.

80.     Alstom provided additional documentation requested by the Sureties on June 28, 2022.  A true and correct copy of this letter is attached hereto as Exhibit C.  Alstom's latest submission reflects its updated damages calculations based on its best current information on this ongoing Project, summarized as follows:

| Claim | Value |
|-------|-------|
| Request for Equitable Adjustment for Extension of Time (2019-2020) | $ 23,549,209.86 |
| Request for Equitable Adjustment for Extension of Time (2021) | $  9,358,766.77 |
| Request for Equitable Adjustment for Extension of Time (2022) | $  1,523,418.25 |
| Request for Equitable Adjustment for Additional Measures for 2018 Vehicle Production Requested by NJ State Commissioner and NJ Transit | $  4,543,596.35 |
| Request for Equitable Adjustment for Delays Outside Alstom Control – 50 Lost Cars (Alstom's Train Car Impacts Claim) | $  2,645,657.92 |
| Undisputed and Unpaid Invoices | $  4,602,583.26[1] |
| **TOTAL** | **$ 46,223,232.41** |

---

[1] Parsons recently issued payment for a portion of these undisputed and unpaid invoices. As of August 5, 2022, the outstanding amount is $3,537,089.26

## COUNT I
## BREACH OF CONTRACT
### (Alstom v. Parsons)

81.     Alstom hereby incorporates by reference the averments of Paragraphs 1 through 80 as if set forth fully herein.

82.     The Subcontract is valid and enforceable.

83.     The Subcontract obligated Parsons to, among other things:

(a)  Compensate Alstom and grant schedule extensions for revisions to the schedule that increased Alstom's cost and time of performance;

(b)  Compensate Alstom and grant schedule extensions for directives that increased Alstom's cost and time of performance; and

(c)  Make prompt payment to Alstom upon Parsons receipt of payment from New Jersey Transit for Alstom's work.

84.     Parsons repeatedly extended the Project and directed Alstom to perform additional work.

85.     Alstom then performed and provided Parsons with its estimated additional cost of performance in accordance with the Subcontract.

86.     Parsons, however, failed to attempt to agree on a value of the work with Alstom, or otherwise issue a change order that afforded Alstom compensation and an extension of time.  In further breach of the Subcontract, Parsons has received over $15M from New Jersey Transit on Alstom's behalf that it has refused to release to Alstom.

87.     Despite Parsons' continued expansion of Alstom's scope of work and schedule of performance, it has refused to issue payment for Alstom's additional efforts.  At the same time, Parsons has failed to issue payment for over $3.5M in undisputed invoices.

WHEREFORE, Plaintiff Alstom Signaling Inc. respectfully requests judgment in its favor and against Parsons Transportation Group Inc. in an amount in excess of $75,000 and hereby

requests interest, costs of suit, penalties, attorneys' fees, and other such relief as this Court determines is proper and just under the circumstances.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**
**(Alstom v. Parsons)**

88.     Alstom hereby incorporates by reference the averments of Paragraphs 1 through 87 as if set forth fully herein.

89.     The implied covenant of good faith and fair dealing is inherent in every contract arising under New Jersey law.

90.     The Subcontract is valid and enforceable.

91.     At all relevant times, Parsons owed Alstom a duty of good faith and fair dealing.

92.     Parsons has breached the implied covenant of good faith and fair dealing by, *inter alia*: (i) failing to respond to Alstom's REA associated with vehicle production impacts; (ii) failing to submit Alstom's REA associated with vehicle production to New Jersey Transit, thereby prejudicing Alstom and/or Parsons' ability to receive cost and schedule relief from New Jersey Transit; (iii) excluding Alstom from discussions with New Jersey Transit and then settling certain Alstom REAs against Alstom's express direction and for woefully insufficient amounts; (iv) agreeing to a combined settlement with New Jersey Transit for Alstom and Parsons' REAs that did not adequately protect Alstom's contractual rights and benefits; (v) failing to provide information regarding New Jersey Transit's apportionment of Parsons' combined settlement; and (vi) repeatedly agreeing to perform additional and extended work for New Jersey Transit, and then imposing its commitment to perform additional and extended work on Alstom without resort to any contractual mechanism.

93.     As a result of this and other conduct, Alstom was deprived of the rights and benefits of the parties' Subcontract and has suffered damages.

WHEREFORE, Plaintiff Alstom Signaling Inc. respectfully requests judgment in its favor and against Parsons Transportation Group Inc. in an amount in excess of $75,000 and hereby requests interest, costs of suit, penalties, attorneys' fees, and other such relief as this Court determines is proper and just under the circumstances.

**COUNT III**
**VIOLATION OF THE NEW JERSEY PROMPT PAYMENT ACT, N.J.S.A. 2A:30A-2**
**(Alstom v. Parsons)**

94.     Alstom hereby incorporates by reference the averments of Paragraphs 1 through 93 as if set forth fully herein.

95.     Alstom has performed work at the direction of Parsons and work that was otherwise required for completion of the Project, as described in the various requests for equitable adjustment Alstom submitted to Parsons, all of which were outside the scope of work in the Subcontract and/or otherwise caused an increase in the cost of and time for performance of Alstom's work.

96.     Alstom performed this work in accordance with the provisions of the Subcontract and the work has been accepted by Parsons and/or New Jersey Transit.

97.     Alstom has submitted requests for equitable adjustment for this work and, under the terms of the Subcontract, Alstom is entitled to an equitable adjustment to the Subcontract and subsequent payment for the increased costs of and time for performance of such work.

98.     Parsons has received payment for Alstom's work but has failed to remit payment in accordance with § 2A:30A-2.

99.     Parsons has also failed to pay Alstom the amounts it is due under its applications for payment.

100.    Parsons' failure to pay Alstom the amounts it is due is a violation of §

2A:30A-2.

101.    Under § 2A:30A-2, Parsons is liable for the amount of money owed to

Alstom, plus interest at a rate equal to the prime rate plus 1%, which began to accrue on the day after

the required payment date, and for Alstom's costs and attorneys' fees.

WHEREFORE, Plaintiff Alstom Signaling Inc. respectfully requests judgment in its

favor and against Parsons Transportation Group Inc. in an amount in excess of $75,000 and hereby

requests interest, costs of suit, penalties, attorneys' fees, and other such relief as this Court

determines is proper and just under the circumstances.

## COUNT IV
## VIOLATION OF THE NEW JERSEY PROMPT PAYMENT ACT, N.J.S.A. 52:32-41
**(Alstom v. Parsons)**

102.    Alstom hereby incorporates by reference the averments of Paragraphs 1

through 101 as if set forth fully herein.

103.    The Prime Contract, incorporated by reference into the Subcontract, requires

Parsons to "comply with the provisions of N.J.S.A § 52:32-40 and § 52:32-41, concerning the prompt

payment of Subcontractors and suppliers, which are hereby made a part of this Contract."

104.    Alstom has performed work at the direction of Parsons and work that was

otherwise required for completion of the Project, as described in the various requests for equitable

adjustment Alstom submitted to Parsons, all of which were outside the scope of work in the

Subcontract and/or otherwise caused an increase in the cost of and time for performance of Alstom's

work.

105.    Alstom performed this additional work in accordance with the provisions of

the Subcontract.

106.     Alstom has submitted requests for equitable adjustment for this work and, under the terms of the Subcontract, Alstom is entitled to an equitable adjustment to the Subcontract and subsequent payment for the increased costs of and time for performance of such work.

107.     Parsons has received payment for Alstom's work but has failed to remit payment in accordance with § 52:32-41.

108.     Parsons has also failed to pay Alstom the amounts it is due under its applications for payment.

109.     Parsons' failure to pay Alstom the amounts it is due is a violation of § 52:32-41.

110.     Under § 52:32-41, Parsons is liable for the amount of money owed to Alstom, plus interest at a rate equal to the prime rate plus 1%, which began to accrue on the day after the required payment date, and for Alstom's court costs.

WHEREFORE, Plaintiff Alstom Signaling Inc. respectfully requests judgment in its favor and against Parsons Transportation Group Inc. in an amount in excess of $75,000 and hereby requests interest, costs of suit, penalties, attorneys' fees, and other such relief as this Court determines is proper and just under the circumstances.

## COUNT V
## BREACH OF BOND OBLIGATIONS
**(Alstom v. Fidelity and Deposit Company of Maryland and Federal Insurance Company)**

111.     Alstom hereby incorporates by reference the averments of Paragraphs 1 through 110 as if set forth fully herein.

112.     Fidelity and Deposit Company of Maryland, and Federal Insurance Company, as sureties, issued Performance and Payment Bonds for the Project on behalf of their Principal, Parsons.  (Bond Nos. 09051680, 82060817, 09121517, and 81619239) (collectively, the "Bonds").

Despite Alstom's requests, the Sureties have failed to provide a copy of the Bonds to Alstom.  Upon information and belief, a true and correct copy of the Bonds is attached as Exhibit D.

113.    By virtue of the Bonds, Parsons and the Sureties are jointly and severally bound to pay for labor, materials, and equipment furnished for use in the performance of the Project.

114.    In accordance with N.J.S.A § 2A:44-143, *et. seq.*, Alstom, as a first tier subcontractor to Parsons, is a beneficiary to the Bonds.

115.    As a result of the continuing and outstanding balances due by Parsons to Alstom, Alstom submitted its Bond Claim to the Sureties on February 16, 2022 (Exhibit B).

116.    Alstom provided additional documentation requested by the Sureties on June 28, 2022 (Exhibit C).  The Sureties' failure and refusal to pay Alstom for the labor and materials that it provided on the Project constitute a breach of the Sureties' obligations under the Bonds.

117.    Alstom has satisfied all conditions precedent to bringing this claim against the Bonds.

WHEREFORE, Plaintiff Alstom Signaling Inc. respectfully requests judgment in its favor and against Fidelity and Deposit Company of Maryland and Federal Insurance Company in an amount in excess of $75,000 and hereby requests interest, costs of suit, penalties, attorneys' fees, and other such relief as this Court determines is proper and just under the circumstances.

## NOTICE OF OTHER ACTIONS PURSUANT TO L. CIV. R. 11.2

The undersigned hereby declares under penalty of perjury under the laws of the United States of America that the matter in controversy is not the subject of any other action or proceeding in any court or of a pending arbitration proceeding, and that no other action or arbitration proceeding is contemplated.

## CERTIFICATION OF NON-ARBITRABILTY UNDER L. CIV. R. 201.1

The undersigned hereby certifies that the damages in this action are in excess of $150,000, exclusive of interest and costs, and thus not eligible for arbitration under L. Civ. R. 201.1(d)(3).

Respectfully Submitted,

/s/ Joseph T. Imperiale
Joseph T. Imperiale
Joseph.Imperiale@troutman.com
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Jeffrey A. Carr
Jeff.Carr@troutman.com
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540-6589
(609) 951-4116

*Attorneys for Plaintiff*
*Alstom Signaling Inc.*

Dated: August 23, 2022